**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **LARRY COTTON,** ) | |
| **#135533,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:20-cv-642-ECM-CWB** |
| ) | |
| **REOSHA BUTLER, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

I.    **Procedural Background**

Plaintiff Larry Cotton, a *pro se* inmate, filed this action pursuant to 42 U.S.C. § 1983.

(Docs. 1 & 2).   Cotton subsequently filed an amended complaint, which is now the

operative pleading.   (Doc. 6).   The amended complaint names the following as defendants:

Ventress Correctional Facility Warden Reosha Butler, Easterling Correctional Facility Warden

John Crow, former Alabama Department of Corrections ("ADOC") Commissioner Jefferson

Dunn,[1]  Associate ADOC Commissioner Cheryl Price,[2]  and Wexford Health Administrator

Celeste Hunter.   (*Id*. at pp. 1-2).

According to Cotton, ADOC inmates who tested positive for COVID-19 in June 2020 were

transferred to Ventress Correctional Facility, which is where he was being incarcerated.   (*Id*. at

---

[1] John Hamm has replaced Jefferson Dunn as Commissioner for the Alabama Department of Corrections.   Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Hamm thus is automatically substituted as a defendant in his official capacity.   Former Commissioner Dunn remains a defendant in his individual capacity.   The Clerk of Court is DIRECTED to update the docket sheet and caption accordingly.

[2] Cheryl Price was incorrectly identified in the amended complaint and on the docket as "Sherry Price."

pp. 2-3).   Although Cotton had not contracted COVID-19 at the time this action was filed, he claims "the transfer of the deadly disease to [his] camp was unreasonable, and made Ventress a very unsafe place." (*Id*. at p. 8).   Based upon those allegations, Cotton purports to bring an Eighth Amendment deliberate indifference claim and a Fourteenth Amendment equal protection claim.[3]  For relief, Cotton seeks monetary damages, for the court to "order Warden Butler to be more cairfull [sic] next time, and call (CDC) if anyone try's [sic] to put a deadly virus in her camp," and for the court to tell Warden Crow "not to release anyone for transfer that has a serious disease or virus that can cause death in another camp."[4]  (*Id*. at p. 6).

On September 22, 2020, the court issued an Order directing the defendants to file a Special Report addressing Cotton's claims (Doc. 7), which the defendants did by submissions on October 19, 2020 (Doc. 30) and December 14, 2020 (Doc. 42).   In their Special Reports, which were accompanied by various evidentiary materials, the defendants moved for summary judgment or dismissal.   (Docs. 30 & 42).   The defendants also filed supplements to their Special Reports (Docs. 32, 34, & 37), as well as responses to Cotton's motion for a preliminary injunction (Docs. 23 & 40).   On December 15, 2020, the court issued another Order directing Cotton to respond to the defendants' Special Reports with affidavits or statements made under penalty of

---

[3] Throughout the amended complaint, Cotton maintains that his Eighth and Fourteenth Amendment rights have been violated by the defendants' conduct. (*See generally* Doc. 6). He also states that the Fourteenth Amendment "gives [him] the rights to the equal protection of the law." (*Id*. at p. 8). Thus, the court will treat Cotton's *pro se* pleading liberally and, in an abundance of caution, construe it as attempting to state a Fourteenth Amendment equal protection claim in addition to an Eighth Amendment deliberate indifference claim.

[4] Cotton also sought a preliminary injunction "for the state to send all the COVID-19 patients back to the camp they came from, and not bring anymore to Ventress … ." (Doc. 6 at p. 5). However, Cotton's motion for preliminary injunction has been denied.  (*See* Docs. 41 & 46).

perjury and other evidentiary materials.  (Doc. 43). The court received Cotton's response on January 7, 2021. (Doc. 45).

In its December 15, 2020 Order, the court notified the parties that "the court may at any time [after expiration of the time for Cotton to file a response] and without further notice to the parties (1) treat the special reports, as supplemented, responses to the motion for preliminary injunction[,] and all supporting evidentiary materials as motions for summary judgment, and (2) after considering any response [by Cotton], rule on the dispositive motions in accordance with the law."  (Doc. 43 at p. 3) (emphasis omitted)).  Pursuant to that disclosure, the undersigned Magistrate Judge will now construe the Special Reports as motions for summary judgment and will recommend that judgment be granted in favor of the defendants on all claims.

## II.    Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party … .  [A fact] is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied that burden, the nonmovant is required to cite portions of the record showing a genuine dispute of material fact. *Id.* at 324. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish a genuine dispute of

3

material fact, the nonmovant must produce evidence such that a reasonable trier of fact could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Summary judgment also should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   Relevant Facts[5]

The following facts are derived from Cotton's verified amended complaint (Doc. 6), the sworn or verified evidentiary materials presented by the defendants (Docs. 23-1 through 23-2; Doc. 30-1; Docs. 32-1 through 32-2; Docs. 34-1 through 34-5; Doc. 37-1; Docs. 40-1 through 40-4), and Cotton's verified response (Doc. 45).

As to Warden Butler, Cotton alleges:

Warden Butler, every science she has been here at Ventress, has done all she could to make this a safe prison. She has … got the inmate on inmate violents way down, she has also done everything in her power to treat everyone equal no matter who you are[.] With this said[,] I have doubts about her OKing the COVID-19 patient

---

[5] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

in her camp. [B]ut for some reason [she] did with an indifference to an unreasonable risk of a serious harm, or death to me … . Warden Butler should have call the Center of Disease Control, and Prevention, and they would have made them take them back, and this is where she showed her negligence in her duty to keep me safe and protect me from an unreasonable risk of serious harm, or death from COVID-19 due to the exposure of this disease … .

(Doc. 6 at p. 7).

As to Warden John Crow, Cotton alleges:

The warden at Eastling Corr. Facility knew she/he was transferring positive COVID-19 patients to Ventress Corr. Facility which was COVID-19 free[.] This transfer violated my constitutional Amend 8, for it did and has put me in an unreasonable risk of serious harm, or death. This she/he has created a very unsafe condition for me, and this is unusual punishment.

(*Id*. at p. 4).

As to former Commissioner Dunn, Cotton alleges:

[Commissioner] Dunn has knowingly an [sic] willfully violated my constitutional rights under the 8th and 14th Amendments … through his willfull [sic] negligence of the transfer of the positive tested COVID-19 patients from Easterling to a COVID-19 free camp, Ventress[.] [H]e did not take any reasonable care, in which is a part of his duty to protect and keep me safe at the best of his ability, not to deliberately spread a deadly disease to Ventress Corr. fac. where I am at. This he has not taken any reasonable care in his duty … . He should have detained the deadly disease where it was, not spread it accross [sic] the state prisons[.]

(*Id*. at p. 8).

As to Associate Commissioner Cheryl Price, Cotton alleges:

Ass. Prison Comm. [] Price, did show a deliberate negligence for human life by the deliberate spread and exposure of the deadly disease COVID-19 to Ventress Corr. facility. … [She] is the one that sign for any and all inmate transfer's in the Alabama D.O.C. She is over the transfer section, and if the transfer paper were sign it was done under the color of law, and this show's a deliberate indifference to my life, and safety from, an unreasonable risk of COVID-19 that should have been under quarantine at Easterling, where they were tested positive at.

(*Id*. at pp. 10-11).

Finally, as to Celeste Hunter, Cotton alleges:

> Celeste Hunter … has violated my Eighth Amendment under a deliberate indifference of my health, for they denyed [sic] me totale [sic] actcess [sic] to mental health for mental stress [] and temperature chick's [sic] [.]
>
> [] I am in H-Dorm and we have started having inmates that has tested positive for COVID-19. The first day we were put on lockdown, we could not get medical to come to the dorm and check our temperature. This act just added to my mental and psychological stress I was all ready having.

(*Id*. at p. 4).

> Cotton additionally alleges more generally as follows:
>
> Ventress Corr. facility is so overcrowed [sic] that [inmates] sleep less than four feet apart and the temperture [sic] in the day gets from 98° to 102° in the dorm, an when I go to eat I have to sit shoulder to shoulder with other inmates in the dineing [sic] hall, and this alone makes Ventress . . . an incubator for growing bacteria, and diseases[.] … This camp was not sit [sic] up to keep the COVID-19 patients that were sent here, they were put wherever they could put them. [A]nd now it is in my dorm, and I have been under a lot of stress[.]

(*Id*. at p. 9).  Cotton had not contracted COVID-19 at the time he filed this action, but he claims that his dorm was "under lock down as quarantine," which put him "under a lot of stress mentally [sic] and psychology [sic]" and his fear of getting sick "caused [him] not to be able to eat and keep [his food] down." (*Id*.).

In response, the defendants concede that six inmates who tested positive for COVID-19 were transferred from Easterling to Ventress in or around July 2020. (Doc. 23-1 at p. 2; Doc. 30-1 at p. 2; Doc. 40-3 at p. 2).  However, they aver that those inmates were housed under medical quarantine in a specific, designated location that facilitated medical isolation, that their movements were restricted to prevent them from coming into contact with other inmates, and that prison officials have taken, and continue to take, extensive actions to protect inmates and staff from the spread of COVID-19 at Ventress and throughout all ADOC facilities. (Doc. 23-1 at p. 3; Doc. 30-1 at p. 3; Doc. 40 at pp. 6-12; Doc. 40-3 at p. 2).

6

To address the COVID-19 pandemic, the United States Centers for Disease Control and Prevention ("CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." (Doc. 34-4 at p. 2; Doc. 40-2 at p. 2). In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken, including but not limited to:

> (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.

*Archilla v. Witte*, No. 4:20-cv-596, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020). The CDC's Guidance is subject to adaptation for specific institutional settings "based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." (Doc. 34-4 at p. 2; Doc. 40-2 at p. 3).

The defendants aver that they follow the CDC's guidelines, from both a medical and security perspective, and contend that they have taken numerous steps to combat the spread of COVID-19 throughout ADOC facilities:

> From the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Ventress. [Doc. 40-1 at ¶ 7; Doc. 40-3 at ¶ 6]. ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. [*Id*.]. Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure to the virus. [Doc. 40-1 at ¶ 7].

> [] Beginning in early March 2020, recognizing the threat of COVID-19, ADOC developed a plan of action to combat the spread of COVID-19 and to protect the

inmates and staff. As part of ADOC's efforts to reduce the spread of COVID-19, it initiated an education and communication strategy directed to both staff and inmates. [Doc. 40-1 at ¶ 8; Doc. 40-3 at ¶ 6]. These communications consisted of documents and information developed by ADOC's Office of Health Services ("OHS") and the CDC. (*Id*.). The materials provide basic information on COVID-19, such as what it is, how it spreads, and the common symptoms. (*Id*.). Additionally, the documents describe the best methods for protecting oneself and how to help prevent the spread of the virus. (*Id*.). These measures include proper hygiene practices, identifying the signs and symptoms of COVID-19, social distancing, and identifying methods for addressing stress associated with the virus. (*Id*.).

[] In addition to educating staff and inmates, ADOC has taken a number of proactive steps to curb the spread of COVID-19. ADOC, consistent with CDC Guidance, temporarily suspended new intakes[6] and modified the intake process. [Doc. 40-1 at ¶ 9; Doc. 40-3 at ¶ 6]. Additionally, ADOC suspended all outside visitors from entering any facility, and implemented a screening procedure prior [to] transferring inmates between ADOC facilities. [Doc. 40-1 at ¶ 9; Doc. 40-3 at ¶ 6].

For staff, ADOC implemented a pre-work screening procedure and a process for employees who call-in sick. [Doc. 40-1 at ¶ 9; Doc. 40-3 at ¶ 6]. Prior to entering the facility, officers must answer a series of questions and have their temperature checked. (*Id*.). If an officer calls in with an illness, the officer must respond to specific screening questions, and each facility must maintain a log to track all illness related absences. [Doc. 40-1 at ¶ 10].

To provide for a clean environment, ADOC resourced and provided to all facilities, including Ventress, cleaning supplies with instructions for cleaning the facilities and a specific checklist for cleaning kitchens. [Doc. 40-1 at ¶ 11; Doc. 40-3 at ¶ 6]. ADOC acquired and distributed facemasks for officers and inmates. [Doc. 40-1 at ¶ 12; Doc. 40-3 at ¶ 8]. The facemasks provided to inmates include instructions for care and cleaning of the masks, and a written acknowledgment form signed by the inmate acknowledging receipt or refusal of the masks. [Doc. 40-1 at ¶ 12; Doc. 40-3 at ¶ 6].

[] In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rests with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol.

---

[6] ADOC temporarily halted new intakes on March 20, 2020 for a minimum of 30 days to allow it to create an intake procedure that will allow for a 14 day quarantine to help prevent infected inmates from being introduced into the population. [Doc. 40-1 at ¶¶ 9, 14, 15, 18.]

Quarantine and testing occurs based on a three (3) tiered system. [Doc. 40-1 at ¶ 18]. Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. (*Id*.). Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. (*Id*.). Level three requires medical quarantine for any inmate who tests positive for COVID-19. (*Id*.).

In an effort to provide medical care and operate in a reasonable and efficient manner, ADOC established a medical quarantine area at Ventress to accommodate several facilities. [Doc. 40-3 at ¶ 5]. Inmates, including [those] from Easterling [], have been and will be transferred to Ventress for medical quarantine. [Doc. 40-3 at ¶ 5; Doc. 40-4 at p. 3]. The location within the Ventress grounds allowed ADOC to maintain separation of the COVID-19 positive inmates from the general population, and provide necessary medical care for infected inmates. [*Id*.]. Inmates in the medical quarantine area must remain in the specific location. [Doc. 40-3 at ¶ 5]. ADOC provides all necessary services, including meals and medical care, to the inmates within the medical quarantine area. [*Id*.]. No other inmates, including Plaintiff, have or ever had access to medical quarantine area or inmates within the quarantine area. (*Id*.).

[] While ADOC's administration and OHS have worked tirelessly to curb the spread of COVID-19 system-wide, Warden Butler and Ventress staff engaged in the fight on the frontlines. [Doc. 40-3 at ¶ 6]. Warden Butler, supported by [ADOC Associate Commissioner for Health Services Ruth] Naglich, stated that she and her staff have conducted or overseen the following preventative actions and measures at Ventress:

a.  educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c.  providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;[]

d.  continuing medical appointments such as chronic care clinics and sick-call appointments;

e.  suspending copays for inmates seeking medical services;

f.  implementing intensified cleaning and disinfecting procedures;

9

g.  suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

h.  performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

i.  implementing social distancing strategies;

j.  providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

k.  providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l.  implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

m.  monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

n.  testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

> [] To provide a clean environment, Warden Butler established a cleaning schedule that requires all surfaces, including bathrooms and living areas, to be cleaned and sanitized at least two (2) times per shift, for a total of six (6) cleanings per day. [Doc. 40-3 at ¶ 7]. In addition, Warden Butler implemented social distancing measures at Ventress, suspending congregational services, prohibiting religious and educational personnel from entering the facility, and requiring inmates to maintain at least six (6) feet distance while standing in line for meals, phones, or any other matter. (*Id*. at ¶ 8). These efforts are on top of the system-wide restrictions that began in March 2020, suspending all outside work in the community, and all visitation. [*Id*. at ¶ 6].

> ADOC Official[s'] tireless efforts continue to keep the spread of COVID-19 contained at Ventress. As of December 1, 2020, only seventeen inmates have tested positive for COVID-19 since March 2020, and no COVID-19 positive inmate cases remain. [Doc. 40-4 at p. 3]. Additionally, twenty-four officers have tested positive since the beginning of the pandemic and only one staff member remained under self-quarantine as of December 4, 2020. [Doc. 40-3 at ¶ 9].

(Doc. 40 at pp. 6-12; *see also* Doc. 32-1 at p. 3; Doc. 37-1 at p. 5; Doc. 40 at pp. 6-12).

Defendant Hunter has specifically testified that "Inmates are tested for COVID-19 for three separate reasons:"

a. Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms. The medical provider makes the decision to test these patients.

b. Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c. Patients are tested when the decision is made from the OHS to conduct mass testing.

Patients who test positive for COVID-19 are placed in medical isolation. The area of medical isolation is determined by ADOC. Single cells are used until they are filled to capacity. Once that happens arrangements are made for the positive patients to be held in an area separate from other inmates. Again, this area is determined by the ADOC.

Patients who test positive for COVID-19 are screened daily for worsening of symptoms and treated accordingly. This is accomplished by nursing and medical provider assessment. Treatment is based on symptoms and can include medications such as OTC medications (Tylenol, Guiafenesin), or antibiotics, inhalers, as indicated.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

(Doc. 37-1 at pp. 1-2).  At the time this action was filed, however, Cotton had not received a COVID-19 test because he never exhibited any signs or symptoms of COVID-19. (Doc. 32-1 at p. 2; Doc. 40-4 at p. 2). Moreover, Defendant Hunter has testified that Cotton's medical needs have not been delayed or denied at any time (Doc. 32-1 at p. 2), and the evidence reflects that Cotton had numerous medical appointments from May 2020 through September 2020 for various reasons unrelated to COVID-19.  (Doc. 34-1 at p. 2).  Nor were mental health services suspended at Ventress during the pandemic, and inmates who requested or were referred for mental health services were seen by mental health staff.  (Doc. 40-3 at p. 5).

Finally, in response to the defendants' filings, Cotton filed a verified declaration in which he testified that: (1) Warden Butler tried to keep the COVID-positive inmates from Easterling out of Ventress, but was "overroad"; (2) the transfer of the COVID-positive inmates would not have occurred if they had "a medical hold on them"; (3) he is at high risk for COVID-19 because of his age and preexisting illnesses of which Defendant Hunter was aware; (4) he "could not get the medical attention that [he] needed to easy [his] mental state of mind after learning about the COVID-19 being dangerous" and was told "emergencies only"; (5) although the ADOC did some things to prevent the spread of COVID-19, they "could not do the social distancing"; (6) the transfer of the COVID-positive inmates was not "the best way to prevent the spread of COVID-19"; and (7) at some point, Cotton was exposed to other inmates that tested positive for COVID-19 but "was not tested until about 3 ½ to 4 months later."  (Doc. 45).

## IV.    Discussion

### A.    To the extent Cotton seeks monetary damages from Defendants Butler, Crow, Dunn, and Price in their official capacities, those defendants are entitled to sovereign immunity.[7]

Official capacity suits are "in all respects other than name, … treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As such, a state employee may not be

---

[7] Defendant Hunter also asserts that she is entitled to sovereign and qualified immunity.  (Doc. 21 at p. 3).  The briefing indicates that Defendant Hunter works for Wexford Health Sources, Inc., the prison healthcare contractor.  (Doc. 30-1 at p. 1).  As an employee of the contract healthcare provider, Defendant Hunter's qualified immunity argument is foreclosed by *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000).  In *Hinson*, the Eleventh Circuit relied upon the reasoning expressed in *Richardson v. McKnight*, 521 U.S. 399 (1997), where the Supreme Court declined to extend qualified immunity to privately employed prison guards, to hold that qualified immunity may not be extended to privately employed prison physicians.  Thus, based upon *Hinson*, Defendant Hunter cannot claim the protection of qualified immunity.  In addition, for similar reasons that the *Hinson* and *Richardson* courts declined to extend the doctrine of qualified immunity, Defendant Hunter is not entitled to sovereign immunity as available to the State and its employees.

sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the immunity, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996).  With specific respect to the types of claims now being asserted by Cotton, it has been recognized that "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)).  Accordingly, Defendants Butler, Crow, Dunn, and Price are entitled to sovereign immunity as to claims seeking monetary damages against them in their official capacities. *See, e.g., Selensky v. Alabama*, 619 F. App'x 846, 849 (11th Cir. 2015) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees].");  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

    **B.**    **To the extent Cotton seeks monetary damages from Defendants Butler, Crow, Dunn, and Price in their individual capacities, those defendants are entitled to qualified immunity.**

As to Cotton's claims against Defendants Butler, Crow, Dunn, and Price in their individual capacities, qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if the underlying conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not merely a defense against liability but immunity from suit, and

the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citation omitted).

To receive qualified immunity, a defendant first must prove that he or she was acting within the scope of discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The record here establishes that the defendants indeed were acting within the course and scope of their discretionary authority. The burden therefore shifts to Cotton to present evidence that the defendants are not entitled to qualified immunity. *See, e.g., Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To meet that burden, Cotton must show two things: (1) that the defendants committed a constitutional violation and (2) that the constitutional right the defendants violated was "clearly established." *Id.*; *see also Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. ... In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original). The court may analyze the elements "in whatever order is deemed most appropriate for the case," and a finding of qualified immunity is appropriate if sufficient evidence has not been presented as to any one of the elements. *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

i.    **Eighth Amendment Claims**

Prison officials have a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter,

and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.

To survive summary judgment on a conditions of confinement claim, a plaintiff must satisfy both an objective and subjective inquiry.  *Id*. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). Under the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (citation omitted).  In *Swain v. Junior*, the Eleventh Circuit acknowledged "that the risk of COVID-19 satisfies this requirement." 961 F.3d 1276, 1285 (11th Cir. 2020). Under the subjective component, the plaintiff must prove a "deliberate indifference" to that risk by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id*. (citation omitted).

The defendants appear to concede subjective knowledge of the risk posed by COVID-19. (*See, e.g.,* Doc. 40 at p. 14: "ADOC officials (and others) have recognized the risk (generally and to [Cotton] specifically) and have worked tirelessly to combat the spread of the virus.").  Therefore, Cotton's claim hinges on whether any defendant disregarded the risk through conduct that was more than mere negligence. *See Swain*, 961 F.3d at 1285; *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993) (holding that a plaintiff may state an Eighth Amendment claim against prison officials

based upon conditions that "pose an unreasonable risk of serious damage to his future health" if he shows that "he himself is being exposed" to the potential health risk and that "prison authorities are ignoring the possible dangers posed by exposure"). The conduct at issue, however, "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

In *Swain*, the Eleventh Circuit addressed the deliberate indifference standard as it applies to the management of COVID-19 in a prison setting:

> [E]ven while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections … and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred. Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 83-40 … (quotation omitted).

> First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id*. at 844 … (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 … (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, [961 F.3d 829, 842-43 (6th Cir. 2020)] (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

> Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." [] [However,] [f]ailing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

*Id*. at 1287.  Upon finding that failure to stop the spread of COVID-19 and failure to adequately

social distance does not amount to deliberate indifference, the court then turned to the measures

taken by the defendants to mitigate the spread of the virus:

> [T]he [court-commissioned expert] report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." Importantly, we think, while the report noted some social-distancing violations, it concluded that [the facility's] administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the inmates." It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them."
>
> Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:
>
> - "requiring staff and inmates to wear face masks at all times (other than when sleeping)";
> - "conducting screening for all staff entering the facility";
> - "conducting daily temperature screenings for all inmates";
> - "suspending all outside visitation"; and
> - "providing disinfecting and hygiene supplies to all inmates."
>
> [] The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants had implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[]

*Id*. at 1288-89 (citations to the record omitted).  Finally, the court held as follows:

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839-40 … . We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment.

*Id*. at 1289.

Consistent with *Swain*, the undersigned finds that the defendants' conduct in this case does not rise to the level of deliberate indifference. The defendants have provided substantial evidence detailing the numerous steps prison authorities have taken to mitigate the spread of COVID-19 throughout the prison system and, specifically, at Ventress. Without the need to repeat each of those steps, which are provided in detail above, suffice it to say that the defendants have taken significant measures to implement precautions to protect Cotton and other inmates as recommended by the CDC, including—but certainly not limited to—restricting the six inmates transferred from Easterling to medical quarantine in a designated area isolated from other inmates. (Doc. 23-1 at p. 3; Doc. 30-1 at p. 3; Doc. 40-3 at p. 2).

Cotton has largely failed to refute the defendants' evidence with anything more than broad, conclusory assertions that the defendants acted unreasonably by the mere act of transferring COVID-positive inmates to Ventress. (*See generally* Doc. 6). *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."). The court cannot find, based on the evidence, that the mere transfer of COVID-positive inmates constitutes deliberate indifference— particularly in light of the many precautions taken. It simply does not appear from the record that any defendant disregarded or ignored the risk of the virus.

Although Cotton has testified that transfer of COVID-positive inmates was not "the best way to prevent the spread of COVID-19" and that the ADOC "could not do the social distancing" recommended by the CDC, such claims also fail to establish deliberate indifference. As noted above, the Eleventh Circuit has specifically emphasized that one is not deliberately indifferent merely because his or her conduct is ultimately ineffective at preventing the spread of COVID-19. *See Swain*, 961 F.3d at 1287. Nor is one deliberately indifferent by failing to do the impossible, such as maintaining perfect social distancing in a confined space like a correctional facility. *Id*.

The court is acutely cognizant of the serious nature of COVID-19, particularly at the time this action was filed, when the virus was still novel and rampant throughout the United States. The court further empathizes with Cotton's desire for conditions, such as social distancing, more conducive to mitigating the spread of the virus throughout the prison system. However, there is nothing in the record to suggest that the defendants acted less than reasonably under the circumstances with which they were presented. Like the Eleventh Circuit in *Swain*, this court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'" *Swain*, 961 F.3d at 1289.

Moreover, Cotton has failed to establish a genuine dispute of material fact as to his claim that Defendant Hunter denied him medical care. In his amended complaint, Cotton vaguely alleges that Defendant Hunter denied him "totale [sic] actcess [sic] to mental health for mental stress" and that, on one particular occasion, he "could not get medical to come to the dorm and check [his] temperature [sic]." (Doc. 6 at p. 4). In his responsive declaration, Cotton further states that he "could not get the medical attention that [he] needed to easy [his] mental state of mind after learning about the COVID-19 being dangerous" and, at some point, he was exposed to other

inmates that tested positive for COVID-19 but "was not tested until about 3 ½ to 4 months later." (Doc. 45).  As to each of those allegations, Cotton fails to provide any supporting detail such as when he sought specific medical care, from whom, and how or why such care was denied.  He also fails to identify any specific individual from whom he sought medical care—much less that he sought care from Defendant Hunter—or provide any allegations or evidence that medical care was needed at the time it was purportedly denied.

The evidence demonstrates that Cotton would have been tested for COVID-19 if he had exhibited any outward symptoms, but he never exhibited any signs or symptoms of COVID-19. (Doc. 32-1 at p. 2; Doc. 37-1 at pp. 1-2; Doc. 40-4 at p. 2).  It further demonstrates that Cotton had numerous medical appointments from May 2020 through September 2020 (Doc. 34-1 at p. 2) and that mental health services remained available at Ventress throughout the pandemic (Doc. 40-3 at p. 5).  And it fails to demonstrate that Cotton requested, and was denied, medical care at any particular point by any particular prison official.  As such, Cotton's bare allegation that Defendant Hunter denied him medical care, without further factual or evidentiary support, is insufficient to overcome summary judgment. *See Ellis*, 432 F.3d at 1326; *see also Owens v. Sec'y of Fla. Dep't of Corr.*, 812 F. App'x 861, 870 (11th Cir. 2020) (citing *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("[The Eleventh Circuit] has consistently held that conclusory allegations without specific supporting facts have no probative value.")).

Because Cotton has failed to make a showing of deliberate indifference on the part of Defendants Butler, Crow, Dunn, and Price, his claims against those defendants in their individual capacities are barred by qualified immunity, and summary judgment on his Eighth Amendment claim is due to be granted in their favor.  Because Cotton also has failed to make a showing of

deliberate indifference by Defendant Hunter, summary judgment likewise is due to be entered in her favor on the Eighth Amendment claim.

### ii.   Fourteenth Amendment Claims

Finally, construing Cotton's *pro se* pleading liberally, it appears that he also purports to bring a Fourteenth Amendment equal protection claim based on the defendants' conduct in transferring COVID-positive inmates to Ventress.  To the extent Cotton intends to establish such a claim, he has wholly failed to do so.  To overcome summary judgment on an equal protection claim, Cotton must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on race, religion, national origin, or some other constitutionally protected basis.  *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001).  Cotton has done neither.  He has not alleged or provided evidence of any similarly situated prisoners who received more favorable treatment; nor has he alleged or provided evidence that he was somehow discriminated against based on a constitutionally protected basis. Accordingly, Defendants Butler, Crow, Dunn, and Price are entitled to qualified immunity, and summary judgment on Cotton's purported Fourteenth Amendment equal protection claim is due to be granted in their favor.  Moreover, summary judgment likewise is due to be granted in favor of Defendant Hunter on Cotton's purported Fourteenth Amendment claim.

## V.   Conclusion

For the reasons stated above, the undersigned Magistrate Judge hereby **RECOMMENDS** as follows:

- that the defendants' Special Reports (Docs. 30 & 42), which are construed as motions for summary judgment, be granted in favor of the defendants on all claims;
- that this action be dismissed with prejudice.

It is **ORDERED** that any objections to this Recommendation must be filed by September 1, 2023.  An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered.

Failure to file a written objection to this Recommendation shall bar a party from a de novo determination by the District Court of any factual findings or legal conclusions contained herein and shall waive the right of the party to challenge on appeal any subsequent order that is based on factual findings and legal conclusions accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *see Resol. Tr. Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

**DONE** this the 18th day of August 2023.

_____

**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**